## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DUANE P. ETHRIDGE, Derivatively on Behalf of Nominal Defendant ELECTRIC LAST MILE SOLUTIONS, INC. F/K/A FORUM MERGER III CORP., <br><br> Plaintiff, <br><br> v. <br><br> BRIAN M. KRZANICH, SHAUNA MCINTYRE, PETER PERETZ, DAVID BORIS, NEIL GOLDBERG, JAMES TAYLOR, JASON LUO, ALBERT LI, ROBERT SONG, STEVEN BERNS, RICHARD KATZMAN, MARSHALL KIEV AND JEFFREY NACHBOR, <br><br> Defendants, <br><br> And, <br><br> ELECTRIC LAST MILE SOLUTIONS, INC. F/K/A FORUM MERGER III CORP., <br><br> Nominal Defendant. | Case No.: <br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br><br><br> **JURY TRIAL DEMANDED** |

Plaintiff Duane P. Ethridge ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Electric Last Mile Solutions, Inc. (f/k/a Forum Merger III Corp.) ("ELM", "Forum", or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy Defendants' (defined below) breaches of fiduciary duties and violations of federal law. Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of

publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Company's directors and officers in their management and control of the Company.

## JURISDICTION AND VENUE

2.      Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u 4(f)).

3.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

4.      This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

5.      Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

**Plaintiff**

6.      Plaintiff purchased shares of Company stock during the time period in issue and continues to hold his Company stock currently.

**Nominal Defendant**

7.     Nominal Defendant ELMS is incorporated in Delaware and its head office is located at 1055 W. Square Lake Road, Troy, MI, 48098.  ELMS's common stock trades on the NASDAQ under the ticker symbol "ELMS" and ELMS's warrants trade on the NASDAQ under the ticker symbol "ELMSW."  Prior to the Merger (defined below), the Company's securities traded on the NASDAQ under the ticker symbols "FIII," "FIIIU," and "FIIIW."

**Director Defendants**

8.     ***Defendant Brian M. Krzanich*** ("Krzanich") is the Chairman of the Board.

9.     ***Defendant Shauna McIntyre*** ("McIntyre") was appointed interim Chief Executive Officer ("CEO") and principal executive officer on February 1, 2022 and has served as a member of the Board since July 2021.

10.     ***Defendant Peter Peretz*** ("Peretz") is a member of the Board.

11.     ***Defendant David Boris*** ("Boris") served as Co-CEO, Chief Financial Officer ("CFO"), and as a director of Forum from its inception until the Merger, whereupon he stepped down from his roles as Co-CEO and CFO and continued serving as a director of the merged Company. Defendant Boris is a managing member of Forum Capital Management III LLC ("Forum Capital"), which is the managing member of Forum Investors III LLC ("Sponsor"). Defendant Boris is also a member of Sponsor.

12.     Defendant Boris is entitled to an annual cash retainer of $100,000 and an annual grant of restricted stock units valued at $100,000 for his service as a director.

13.     ***Defendant Neil Goldberg*** ("Goldberg") served as a director of Forum from its IPO until the Merger, whereupon he began serving as a director of the merged Company. Defendant Goldberg also serves as a member of the Audit Committee and the Compensation

Committee.  Defendant Goldberg is a member of Sponsor.

14.    Defendant Goldberg is entitled to an annual cash retainer of $100,000 and an annual grant of restricted stock units valued at $100,000 for his service as a director of the Company.

15.    Defendants Krzanich, McIntyre, Peretz, Boris and Goldberg are herein referred to as the "Director Defendants".

**<u>Officer Defendants</u>**

16.    ***Defendant James Taylor*** ("Taylor") served as the Company's CEO following the Merger until February 1, 2022.  Prior to the Merger, Defendant Taylor was Electric Last Mile, Inc.'s co-founder and CEO.  Defendant Taylor received an annual base salary of $480,000 as of the consummation of the Merger, and he was also entitled to an annual target bonus opportunity of 100% of base salary.

17.    ***Defendant Jason Luo*** ("Luo") served as the Company's Executive Chairman following the Merger until February 1, 2022.  Prior to the Merger, Defendant Luo was Electric Last Mile, Inc.'s co-founder and Executive Chairman.  Defendant Luo received an annual base salary of $480,000 as of the consummation of the Merger, and he was also entitled to an annual target bonus opportunity of 100% of base salary.

18.    ***Defendant Albert Li*** ("Li") served as the Company's CFO from June 2021 through November 2021.

19.    ***Defendant Robert Song*** ("Song") has served as the Company's CFO and Treasurer since November 2021.

20.    Defendants Taylor, Luo, Kiev, Li and Song are herein referred as the "Officer Defendants".

21.     The Director Defendants together with Defendants Taylor, Luo, Kiev, Li and Song are herein referred to as "Defendants".

**Other Defendants**

22.     ***Defendant Steven Berns*** ("Berns") served as a director of Forum from its IPO until the Merger.  In addition, Defendant Berns is a member of Sponsor, which held 5.5% of the Company as of June 25, 2021.

23.     ***Defendant Richard Katzman*** ("Katzman") served as a director of Forum from its IPO until the Merger.  Defendant Katzman is also a member of Sponsor.

24.     ***Defendant Marshall Kiev*** ("Kiev") served as the Co-CEO, President, and as a director of Forum from its inception until the Merger.  Defendant Kiev is a managing member of Forum Capital, which is the managing member of Sponsor, which held 5.5% of the Company following the Merger.  Defendant Kiev is also a member of Sponsor.

25.     ***Defendant Jeffrey Nachbor*** ("Nachbor") served as a director of Forum from its IPO until the Merger.  Defendant Nachbor is a member of Sponsor.

26.     Defendant Berns, Boris, Goldberg, Katzman, Kiev and Nachbor are collectively referred to herein as the "Forum Defendants".

27.     Defendants Taylor, Luo, Li, and Song (the "ELMI Defendants").

**The Company's Audit Committee Charter**

28.     According to the Audit Committee Charter, the Audit Committee's purposes is to assist the Board in the oversight over the Company's "accounting and financial reporting process and the audits of the Company's financial statements."

29.     According to the Audit Committee Charter, the Audit Committee's responsibility is to review and discuss with management and the independent auditor, *inter alia*: (1) "major

issues regarding accounting principles and financial statement presentations"; and (2) "major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies."

## BACKGROUND

30.    ELM is a manufacturer of electric commercial vehicles headquartered in Troy, Michigan.  Its business consists of designing, engineering, manufacturing, and customizing electric vehicles for the "last mile" of delivery. Its principal offerings include the Urban Delivery, a cargo van, and the Urban Utility, a cargo truck. The Company's functional predecessor Electric Last Mile, Inc. ("ELMI") was co-founded in August 2020 by Defendants Taylor and Luo.

31.    Before the merger that resulted in ELM, Forum was a special purpose acquisition company ("SPAC"), also known as a blank check company, created for the purpose of raising capital through an initial public offering and using the capital infusion to acquire an existing company.  Forum was incorporated in Delaware on June 25, 2019 and completed its initial public offering on August 21, 2020 (the "IPO"), netting gross proceeds of $250 million.

32.    On December 11, 2020, Forum and ELMI announced that they had entered into an agreement to merge and certain ancillary agreements on December 10, 2020.  Pursuant to the terms of the agreements, ELMI would merge with a subsidiary of Forum called ELMS Merger Corp. ("Merger Sub"), with ELMI surviving the merger and becoming a wholly owned subsidiary of Forum, which would rename itself Electric Last Mile Solutions, Inc.

33.    On June 25, 2021, ELMI, Merger Sub, and Forum consummated the anticipated business combination (the "Merger"), and the Company changed its name to Electric Last Mile Solutions, Inc.

## FALSE AND MISLEADING STATEMENTS

34.     On March 31, 2021, the Company filed with the SEC its annual report for the year ended December 31, 2020 (the "2020 Annual Report") signed by Defendant Boris.  Attached to the 2020 Annual Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Kiev and Boris attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

35.     The 2020 Annual Report contained the following financial statements:

**FORUM MERGER III CORPORATION**
**CONSOLIDATED BALANCE SHEETS**

| | December 31 | |
| --- | --- | --- |
| | 2020 | 2019 |
| **ASSETS** | | |
| Current assets | | |
| Cash | $ 1,555,497 | $ 19,810 |
| Prepaid expenses | 157,486 | — |
| Total Current Assets | 1,712,983 | 19,810 |
| Deferred offering costs | — | 62,726 |
| Cash and marketable securities held in Trust Account | 250,066,590 | — |
| **TOTAL ASSETS** | $ 251,779,573 | $ 82,536 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities | | |
| Accrued expenses | $ 3,329,929 | $ 1,966 |
| Accrued offering costs | — | 57,726 |
| Total Current Liabilities | 3,329,929 | 59,692 |
| Deferred underwriting fee payable | 8,750,000 | — |
| **TOTAL LIABILITIES** | 12,079,929 | 59,692 |
| **Commitments and Contingencies** | | |
| Class A common stock subject to possible redemption, 23,469,964 and none shares at redemption value as of December 31, 2020 | 234,699,640 | — |
| **Stockholders' Equity** | | |
| Preferred stock, $0.0001 par value; 1,000,000 shares authorized, none issued and outstanding | — | — |
| Class A common stock, $0.0001 par value; 100,000,000 shares authorized; 2,271,286 and none issued and outstanding (excluding 23,469,964 and none shares subject to possible redemption) as of December 31, 2020 and 2019, respectively | 227 | — |
| Class B common stock, $0.0001 par value; 10,000,000 shares authorized; 6,250,000 and 7,187,500 shares issued and outstanding as of December 31, 2020 and 2019, respectively [1] | 625 | 719 |
| Additional paid-in capital | 8,551,740 | 24,281 |
| Accumulated deficit | (3,552,588) | (2,156) |
| **Total Stockholders' Equity** | 5,000,004 | 22,844 |
| **Total Liabilities and Stockholders' Equity** | $ 251,779,573 | $ 82,536 |

(1) At December 31, 2019, the shares issued and outstanding include 937,500 shares of Class B common stock forfeited on October 5, 2020 as a result of the expiration of the underwriter's option to exercise their over-allotment (see Note 5).

**FORUM MERGER III CORPORATION**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | Year Ended December 31, 2020 | For the Period from June 25, 2019 (Inception) Through December 31, 2019 |
| --- | --- | --- |
| Formation and operational costs | $ 3,617,022 | $ 2,156 |
| **Loss from operations** | (3,617,022) | (2,156) |
| Other income: | | |
| Interest earned on marketable securities held in Trust Account | 66,590 | — |
| **Net loss** | $ (3,550,432) | $ (2,156) |
| Weighted average shares outstanding of Class A redeemable common stock | 25,000,000 | — |
| **Basic and diluted net income per share, Class A** | $ 0.00 | $ 0.00 |
| Weighted average shares outstanding of Class A and Class B non-redeemable common stock [1] | 6,518,068 | 6,250,000 |
| **Basic and diluted net loss per share, Class A and Class B non-redeemable common stock** | $ (0.54) | $ (0.00) |

(1) At December 31, 2019, the weighted average shares outstanding include up to 937,500 shares of Class B common stock forfeited on October 5, 2020 as a result of the expiration of the underwriter's option to exercise their over-allotment (see Note 5).

**FORUM MERGER III CORPORATION**
**CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY**

| | Class A Common Stock | | Class B Common Stock | | Additional Paid-in Capital | Stock Subscription Receivable from Stockholder | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| **Balance – June 25, 2019** | — | $ — | — | $ — | $ — | $ — | $ — | $ — |
| Issuance of Class B common stock to Sponsor [1] | — | — | 7,187,500 | 719 | 24,281 | (25,000) | — | — |
| Collection of stock subscription receivable from stockholder | — | — | — | — | — | 25,000 | — | 25,000 |
| Net loss | — | — | — | — | — | — | (2,156) | (2,156) |
| **Balance – December 31, 2019** | — | — | 7,187,500 | 719 | 24,281 | — | (2,156) | 22,844 |
| Sale of 25,000,000 Units, net of underwriting discounts | 25,000,000 | 2,500 | — | — | 235,812,232 | — | — | 235,814,732 |
| Sale of 741,250 Private Placement Units | 741,250 | 74 | — | — | 7,412,426 | — | — | 7,412,500 |
| Forfeiture of Founder Shares | — | — | (937,500) | (94) | 94 | — | — | — |
| Class A common stock subject to possible redemption | (23,469,964) | (2,347) | — | — | (234,697,293) | — | — | (234,699,640) |
| Net loss | — | — | — | — | — | — | (3,550,432) | (3,550,432) |
| **Balance – December 31, 2020** | 2,271,286 | $ 227 | 6,250,000 | $ 625 | $ 8,551,740 | $ — | $ (3,552,588) | $ 5,000,004 |

(1) Includes 937,500 shares of Class B common stock forfeited on October 5, 2020 as a result of the expiration of the underwriter's option to exercise their over-allotment (see Note 5).

**FORUM MERGER III CORPORATION**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | Year Ended December 31, 2020 | For the Period from June 25, 2019 (Inception) Through December 31, 2019 |
|---|---|---|
| **Cash Flows from Operating Activities:** | | |
| Net loss | $ (3,550,432) | $ (2,156) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Interest earned on marketable securities held in Trust Account | (66,590) | — |
| Changes in operating assets and liabilities: | | |
| Prepaid expenses | (157,486) | — |
| Accrued expenses | 3,327,963 | 1,966 |
| **Net cash used in operating activities** | (446,545) | (190) |
| **Cash Flows from Investing Activities:** | | |
| Investment of cash into Trust Account | (250,000,000) | — |
| **Net cash used in investing activities** | (250,000,000) | — |
| **Cash Flows from Financing Activities:** | | |
| Proceeds from issuance of Class B common stock to Sponsor | — | 25,000 |
| Proceeds from sale of Units, net of underwriting discounts paid | 245,000,000 | — |
| Proceeds from sale of Private Placement Units | 7,412,500 | — |
| Proceeds from promissory note – related party | 40,000 | — |
| Repayment of promissory note – related party | (40,000) | — |
| Payment of offering costs | (430,268) | (5,000) |
| **Net cash provided by financing activities** | 251,982,232 | 20,000 |
| **Net Change in Cash** | 1,535,687 | 19,810 |
| Cash – Beginning of period | 19,810 | — |
| **Cash – End of period** | $ 1,555,497 | $ 19,810 |
| **Non-cash investing and financing activities:** | | |
| Offering costs included in accrued offering costs | $ — | $ 57,726 |
| Initial classification of Class A common stock subject to possible redemption | $ 238,249,360 | $ — |
| Change in value of Class A common stock subject to possible redemption | $ (3,549,720) | $ — |
| Deferred underwriting fee payable | $ 8,750,000 | $ — |

36.     On May 7, 2021, the Company filed with the SEC an amendment to its 2020 Annual Report on Form 10-K/A (the "2020 Amendment") signed by Defendant Boris.  Attached to the 2020 Amendment were certifications pursuant to SOX signed by Defendants Kiev and Boris attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

37.     The 2020 Amendment contained the following financial statements:

**FORUM MERGER III CORPORATION**
**CONSOLIDATED BALANCE SHEETS**

| | December 31 | |
|---|---|---|
| | 2020 | 2019 |
| | (As Restated) | |
| **ASSETS** | | |
| Current assets | | |
| Cash | $ 1,555,497 | $ 19,810 |
| Prepaid expenses | 157,486 | — |
| Total Current Assets | 1,712,983 | 19,810 |
| Deferred offering costs | — | 62,726 |
| Cash and marketable securities held in Trust Account | 250,066,590 | — |
| **TOTAL ASSETS** | $ 251,779,573 | $ 82,536 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities | | |
| Accrued expenses | $ 3,329,929 | $ 1,966 |
| Accrued offering costs | — | 57,726 |
| Total Current Liabilities | 3,329,929 | 59,692 |
| Deferred underwriting fee payable | 8,750,000 | — |
| Warrant liabilities | 29,859,848 | — |
| **TOTAL LIABILITIES** | 41,939,777 | 59,692 |
| **Commitments and Contingencies** | | |
| Class A common stock subject to possible redemption, 20,483,979 and none shares at redemption value as of December 31, 2020 | 204,839,790 | — |
| **Stockholders' Equity** | | |
| Preferred stock, $0.0001 par value; 1,000,000 shares authorized, none issued and outstanding | — | — |
| Class A common stock, $0.0001 par value; 100,000,000 shares authorized; 5,257,271 and none issued and outstanding (excluding 20,483,979 and none subject to possible redemption) as of December 31, 2020 and 2019, respectively | 526 | — |
| Class B common stock, $0.0001 par value; 10,000,000 shares authorized; 6,250,000 and 7,187,500 shares issued and outstanding as of December 31, 2020 and 2019, respectively [1] | 625 | 719 |
| Additional paid-in capital | 34,362,236 | 24,281 |
| Accumulated deficit | (29,363,381) | (2,156) |
| **Total Stockholders' Equity** | 5,000,006 | 22,844 |
| **Total Liabilities and Stockholders' Equity** | $ 251,779,573 | $ 82,536 |

(1)  At December 31, 2019, the shares issued and outstanding includes 937,500 shares of Class B common stock forfeited on October 5, 2020 as a result of the expiration of the underwriter's option to exercise their over-allotment (see Note 6).

**FORUM MERGER III CORPORATION**
**CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY**

| | Class A Common Stock | | Class B Common Stock | | Additional Paid-in Capital | Stock Subscription Receivable from Stockholder | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| Balance – June 25, 2019 | — | $ — | — | $ — | $ — | $ — | $ — | $ — |
| Issuance of Class B common stock to Sponsor [1] | — | — | 7,187,500 | 719 | 24,281 | (25,000) | — | — |
| Collection of stock subscription receivable from stockholder | — | — | — | — | — | 25,000 | — | 25,000 |
| Net loss | — | — | — | — | — | — | (2,156) | (2,156) |
| Balance – December 31, 2019 | — | — | 7,187,500 | 719 | 24,281 | — | (2,156) | 22,844 |
| Sale of 25,000,000 Units, net of underwriting discounts and public warrant liabilities | 25,000,000 | 2,500 | — | — | 231,881,777 | — | — | 231,884,277 |
| Sale of 741,250 Private Placement Units, net of private placement warrant liabilities | 741,250 | 74 | — | — | 7,293,826 | — | — | 7,293,900 |
| Forfeiture of Founder Shares | — | — | (937,500) | (94) | 94 | — | — | — |
| Class A common stock subject to possible redemption | (20,483,979) | (2,048) | — | — | (204,837,742) | — | — | (204,839,790) |
| Net loss | — | — | — | — | — | — | (29,361,225) | (29,361,225) |
| Balance – December 31, 2020 (As Restated) | 5,257,271 | $ 526 | 6,250,000 | $ 625 | $ 34,362,236 | $ — | $ (29,363,381) | $ 5,000,006 |

(1) Includes 937,500 shares of Class B common stock forfeited on October 5, 2020 as a result of the expiration of the underwriter's option to exercise their over-allotment (see Note 6).

38.    On May 26, 2021, the Company filed with the SEC its quarterly report for the period ended March 31, 2021 (the "1Q21 Report") signed by Defendants Kiev and Boris. Attached to the 1Q21 Report were certifications pursuant to SOX signed by Defendants Kiev and Boris attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

39.    The 1Q21 Report contained the following financial statements:

**FORUM MERGER III CORPORATION**
**CONDENSED CONSOLIDATED BALANCE SHEETS**

| | March 31, 2021 (Unaudited) | December 31, 2020 |
|---|---|---|
| **ASSETS** | | |
| Current assets | | |
| Cash | $ 1,038,353 | $ 1,555,497 |
| Prepaid expenses | 174,124 | 157,486 |
| Total Current Assets | 1,212,477 | 1,712,983 |
| Cash and marketable securities held in Trust Account | 250,004,042 | 250,066,590 |
| **Total Assets** | $ 251,216,519 | $ 251,779,573 |
| | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities - Accounts payable and accrued expenses | $ 3,815,030 | $ 3,329,929 |
| Deferred underwriting fee payable | 8,750,000 | 8,750,000 |
| Warrant liabilities | 16,325,028 | 29,859,848 |
| **Total Liabilities** | 28,890,058 | 41,939,777 |
| | | |
| **Commitments and Contingencies** | | |
| Class A common stock subject to possible redemption, 21,732,646 and 20,483,979 shares at redemption value as of March 31, 2021 and December 31, 2020, respectively | 217,326,460 | 204,839,790 |
| | | |
| **Stockholders' Equity** | | |
| Preferred stock, $0.0001 par value; 1,000,000 shares authorized; none issued or outstanding | — | — |
| Class A common stock, $0.0001 par value; 100,000,000 shares authorized; 4,008,604 and 5,257,271 issued and outstanding (excluding 21,732,646 and 20,483,979, none shares subject to possible redemption) as of March 31, 2021 and December 31, 2020, respectively | 401 | 526 |
| Class B common stock, $0.0001 par value; 10,000,000 shares authorized; 6,250,000 shares issued and outstanding as of March 31, 2021 and December 31, 2020 | 625 | 625 |
| Additional paid-in capital | 21,875,691 | 34,362,236 |
| Accumulated deficit | (16,876,716) | (29,363,381) |
| **Total Stockholders' Equity** | 5,000,001 | 5,000,006 |
| **Total Liabilities and Stockholders' Equity** | $ 251,216,519 | $ 251,779,573 |

40.    On June 9, 2021, the Company filed a definitive merger proxy statement on Schedule 14A with the SEC (the "Merger Proxy Statement").   Defendants Kiev, Boris, Goldberg, Katzman, Berns, and Nachbor solicited the Merger Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained misstatements and omissions.

41.    According to the Company's Form 8-K filed on December 11, 2020 with the SEC: "ELMI and its directors and executive officers may also be deemed to be participants in the solicitation of proxies from the stockholders of Forum in connection with the [Merger]." Therefore, the Merger Proxy Statement was also solicited by, at least, Defendants Taylor and Luo.

42.    The Merger Proxy Statement called for Company shareholders to: (i) approve the

Merger; (ii) approve the issuance of more than 20% of the Company's issued and outstanding common stock in connection with the Merger, including to ELMI securityholders and to SF Motors Inc. d/b/a SERES ("SERES"); (iii) approve the Company's third amended and restated certificate of incorporation; (iv) approve on a non-binding advisory basis certain differences between the Company's second amended and restated certificate of incorporation and the proposed third amended and restated certificate of incorporation; (v) to approve a new long term equity incentive plan (the "Incentive Plan"); and (vi) to elect Defendants Taylor, Luo, Boris, Goldberg, Krzanich, McIntyre, and Peretz to serve as directors.  The Merger Proxy Statement stated the following regarding the Board's and the Audit Committee's risk oversight functions:

> Our Board's oversight of risk is administered directly through our Board, as a whole, or through its audit committee. Various reports and presentations regarding risk management are presented to our Board to identify and manage risk.  The audit committee addresses risks that fall within the committee's area of responsibility.  For example, the audit committee is responsible for overseeing the quality and objectivity of the Company's financial statements and the independent audit thereof.  Management furnishes information regarding risk to our Board as requested.

43.    The Merger Proxy Statement also listed certain responsibilities of the Audit Committee. These responsibilities were: (i) "the appointment, compensation, retention, replacement, and oversight of the work of the independent registered public accounting firm engaged by us;" (ii) "pre-approving all audit and permitted non-audit services to be provided by the independent registered public accounting firm engaged by us, and establishing pre-approval policies and procedures;" (iii) "obtaining and reviewing a report, at least annually, from the independent registered public accounting firm describing: (a) the independent registered public accounting firm's internal quality-control procedures; (b) any material issues raised by the most recent internal quality-control review, or peer review, of the audit firm, or by any inquiry or investigation by governmental or professional authorities within the preceding five years

respecting one or more independent audits carried out by the firm and any steps taken to deal with such issues and; (c) all relationships between the independent registered public accounting firm and us to assess the independent registered public accounting firm's independence;" and (d) "reviewing with management, the independent registered public accounting firm, and our legal advisors, as appropriate, any legal, regulatory or compliance matters, including any correspondence with regulators or government agencies and any employee complaints or published reports that raise material issues regarding our financial statements or accounting policies and any significant changes in accounting standards or rules promulgated by the Financial Accounting Standards Board, the SEC or other regulatory authorities."

44.    The Merger Proxy Statement also reported the following regarding the administration of the Incentive Plan:

> A committee of at least two people appointed by the Board (or, if no such committee has been appointed, the Board) (the "Committee") will administer the Incentive Plan. The Committee will generally have the authority to designate participants, determine the type or types of awards to be granted to a participant, determine the terms and conditions of any agreements evidencing any awards granted under the Incentive Plan, accelerate the vesting or exercisability of, payment for or lapse of restrictions on, awards and to adopt, alter and repeal rules, guidelines and practices relating to the Incentive Plan. The Committee will have full discretion to administer and interpret the Incentive Plan and to make any other determinations and/or take any other action that it deems necessary or desirable for the administration of the Incentive Plan, and any such determinations or actions taken by the Committee shall be final, conclusive and binding upon all persons and entities. The Committee may delegate to one or more officers of the Company or any affiliate the authority to act on behalf of the Committee with respect to any matter, right, obligation or election that is the responsibility of or that is allocated to the Committee in the Incentive Plan and that may be so delegated as a matter of law, except for grants of awards to persons subject to Section 16 of the Exchange Act.

45.    Furthermore, the Merger Proxy Statement reported the following financial statements:

### FORUM MERGER III CORPORATION
### CONSOLIDATED BALANCE SHEETS

| | December 31 | |
| --- | --- | --- |
| | 2020 | 2019 |
| | (As Restated) | |
| **ASSETS** | | |
| Current assets | | |
| Cash | $ 1,555,497 | $ 19,810 |
| Prepaid expenses | 157,486 | — |
| Total Current Assets | 1,712,983 | 19,810 |
| | | |
| Deferred offering costs | — | 62,726 |
| Cash and marketable securities held in Trust Account | 250,066,590 | — |
| **TOTAL ASSETS** | **$ 251,779,573** | **$ 82,536** |
| | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities | | |
| Accrued expenses | $ 3,329,929 | $ 1,966 |
| Accrued offering costs | — | 57,726 |
| Total Current Liabilities | 3,329,929 | 59,692 |
| | | |
| Deferred underwriting fee payable | 8,750,000 | — |
| Warrant liabilities | 29,859,848 | |
| **TOTAL LIABILITIES** | **41,939,777** | **59,692** |
| | | |
| **Commitments and Contingencies** | | |
| | | |
| Class A common stock subject to possible redemption, 20,483,979 and none shares at redemption value as of December 31, 2020 | 204,839,790 | — |
| | | |
| **Stockholders' Equity** | | |
| Preferred stock, $0.0001 par value; 1,000,000 shares authorized, none issued and outstanding | — | — |
| Class A common stock, $0.0001 par value; 100,000,000 shares authorized; 5,257,271 and none issued and outstanding (excluding 20,483,979 and none shares subject to possible redemption) as of December 31, 2020 and 2019, respectively | 526 | — |
| Class B common stock, $0.0001 par value; 10,000,000 shares authorized; 6,250,000 and 7,187,500 shares issued and outstanding as of December 31, 2020 and 2019, respectively[1] | 625 | 719 |
| Additional paid-in capital | 34,362,236 | 24,281 |
| Accumulated deficit | (29,363,381) | (2,156) |
| **Total Stockholders' Equity** | **5,000,006** | **22,844** |
| **Total Liabilities and Stockholders' Equity** | **$ 251,779,573** | **$ 82,536** |

---

(1)   At December 31, 2019, the shares issued and outstanding includes 937,500 shares of Class B common stock forfeited on October 5, 2020 as a result of the expiration of the underwriter's option to exercise their over-allotment (see Note 6).

## FORUM MERGER III CORPORATION
## CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY

| | Class A Common Stock | | Class B Common Stock | | Additional Paid-in Capital | Stock Subscription Receivable from Stockholder | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| **Balance – June 25, 2019** | — | $ — | — | $ — | $ — | $ — | $ — | $ — |
| Issuance of Class B common stock to Sponsor[1] | — | — | 7,187,500 | 719 | 24,281 | (25,000) | — | — |
| Collection of stock subscription receivable from stockholder | — | — | — | — | — | 25,000 | — | 25,000 |
| Net loss | — | — | — | — | — | — | (2,156) | (2,156) |
| **Balance – December 31, 2019** | — | — | 7,187,500 | 719 | 24,281 | — | (2,156) | 22,844 |
| Sale of 25,000,000 Units, net of underwriting discounts and public warrant liabilities | 25,000,000 | 2,500 | — | — | 231,881,777 | — | — | 231,884,277 |
| Sale of 741,250 Private Placement Units, net of private placement warrant liabilities | 741,250 | 74 | — | — | 7,293,826 | — | — | 7,293,900 |
| Forfeiture of Founder Shares | — | — | (937,500) | (94) | 94 | — | — | — |
| Class A common stock subject to possible redemption | (20,483,979) | (2,048) | — | — | (204,837,742) | — | — | (204,839,790) |
| Net loss | — | — | — | — | — | — | (29,361,225) | (29,361,225) |
| **Balance – December 31, 2020 (As Restated)** | 5,257,271 | $ 526 | 6,250,000 | $ 625 | $ 34,362,236 | $ — | $ (29,363,381) | $ 5,000,006 |

(1)   Includes 937,500 shares of Class B common stock forfeited on October 5, 2020 as a result of the expiration of the underwriter's option to exercise their over-allotment (see Note 6).

46.     The Merger Proxy Statement was materially misleading because it failed to disclose that: (i) contrary to the Merger Proxy Statement's descriptions of the Board's risk oversight function and the Forum Audit Committee's responsibilities, the Board and Forum's Audit Committee were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements, and thus the Board were breaching their fiduciary duties; and (ii) the Board at that time who were breaching their fiduciary duties and who would serve on the post-Merger Board were improperly interested in increasing their unjust compensation by seeking shareholder approval of the Incentive Plan.

47.     The Merger Proxy Statement also failed to disclose that: (i) certain of the Company's and ELMI's financial statements were false and unreliable; (ii) certain ELMI executives and/or directors had engaged in the improper equity transactions in which they purchased discounted equity without obtaining an independent valuation; and (iii) the Company failed to maintain adequate internal controls.

48.     As a result of the material misstatements and omissions contained in the Merger Proxy Statement, Company shareholders: (i) approved the Merger; (ii) reelected Defendants Boris and Goldberg to the Board; (iii) elected Defendants Luo and Taylor to the Board, who had engaged in the improper equity transactions and who had aided and abetted the breaches of fiduciary duty by the Forum defendants; (iv) elected Defendants McIntyre, Peretz, and Krzanich to the Board, who breached their fiduciary duties to the Company; (v) approved the issuance of more than 20% of the Company's issued and outstanding common stock; (vi) approved the Company's third amended and restated certificate of incorporation; (vii) approved and adopted, on a non-binding advisory basis, certain differences between the Company's former and the third amended and restated certificate of incorporation; and (viii) approved the Incentive Plan,

allowing the Individual Defendants to receive unjust compensation.

49.    On August 13, 2021, the Company filed with the SEC its quarterly report for the period ended June 30, 2021 (the "2Q21 Report") signed by Defendants Taylor and Li.  Attached to the 2Q21 Report were certifications pursuant to SOX signed by Defendants Taylor and Li attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

50.    The 2Q21 Report contained the following financial statements:

ELECTRIC LAST MILE SOLUTIONS, INC.
CONDENSED CONSOLIDATED BALANCE SHEETS (in thousands, except par value and share data)

| | Successor | | Predecessor |
|---|---|---|---|
| | June 30, 2021 | December 31, 2020 | December 31, 2020 |
| | (Unaudited) | | |
| **ASSETS** | | | |
| Current assets: | | | |
| Cash and cash equivalents | $ 171,529 | $ 25,205 | $ — |
| Restricted cash | 45,902 | — | — |
| Prepaid expenses and other current assets | 3,809 | — | 42 |
| Inventories | 824 | — | — |
| Total current assets | 222,064 | 25,205 | 42 |
| Property, plant and equipment, net | 191,966 | — | 131,908 |
| Intangibles and other assets, net | 6,802 | 38 | — |
| TOTAL ASSETS | $ 420,832 | $ 25,243 | $ 131,950 |
| | | | |
| **LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT)** | | | |
| Current liabilities: | | | |
| Accounts payable | $ 7,076 | $ 1,545 | $ 178 |
| Accrued expenses | 2,741 | 5,332 | 1,233 |
| Current portion of land contract and promissory note | 66,658 | — | — |
| Total current liabilities | 76,475 | 6,877 | 1,411 |
| Convertible promissory notes | — | 25,094 | — |
| Land contract and promissory note obligations, net of current portion | 42,716 | — | — |
| Warrant liabilities | 19,447 | — | — |
| Pension benefit obligation | 114 | — | 109 |
| Other long-term liabilities | 443 | — | — |
| Total liabilities | 139,195 | 31,971 | 1,520 |
| COMMITMENTS AND CONTINGENCIES | | | |
| Predecessor parent's net investment | — | — | 130,430 |
| Preferred stock, $0.0001 par value; 100 million shares authorized; none issued or outstanding. | — | — | — |
| Common stock, $0.0001 par value; 1 billion shares authorized; 124,027,012 issued and 118,777,012 outstanding at June 30, 2021 and 82,117,288 issued and outstanding at December 31, 2020. | 12 | 8 | — |
| Additional paid-in capital | 301,467 | 992 | — |
| Accumulated deficit | (19,842) | (7,728) | — |
| Total shareholders' equity (deficit) | 281,637 | (6,728) | 130,430 |
| TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY | $ 420,832 | $ 25,243 | $ 131,950 |

51.     The 2Q21 also stated:

On June 23, 2021, an entity controlled by Jason Luo sold 6,097 common shares of
ELM [Electric Last Mile, In.] back to ELM for the original purchase price of
$10.00 per share or a total of $61 thousand, prior to and in connection with the
issuance of 5,000,000 shares of the Company's common stock to SERES upon the
closing of the Business Combination pursuant to the SERES Asset Purchase
Agreement. This transaction was presented in the condensed consolidated
statement of changes in shareholders' equity (deficit) retroactively applying the
exchange ratio from the Business Combination.

52.     On November 12, 2021, the Company filed with the SEC its quarterly report for
the period ended September 30, 2021 (the "3Q21 Report") signed by Defendants Taylor and
Song. Attached to the 3Q21 Report were certifications pursuant to SOX signed by Defendants
Taylor and Song attesting to the accuracy of financial reporting, the disclosure of any material
changes to the Company's internal control over financial reporting and the disclosure of all
fraud.

53.     The 3Q21 Report contained the following financial statements:

**ELECTRIC LAST MILE SOLUTIONS, INC.**
**CONDENSED CONSOLIDATED BALANCE SHEETS (in thousands, except par value and share data)**

| | Successor | | Predecessor |
|---|---|---|---|
| | June 30, 2021 | December 31, 2020 | December 31, 2020 |
| ASSETS | (Unaudited) | | |
| Current assets: | | | |
| Cash and cash equivalents | $ 171,529 | $ 25,205 | $ — |
| Restricted cash | 45,902 | — | — |
| Prepaid expenses and other current assets | 3,809 | — | 42 |
| Inventories | 824 | — | — |
| Total current assets | 222,064 | 25,205 | 42 |
| Property, plant and equipment, net | 191,966 | — | 131,908 |
| Intangibles and other assets, net | 6,802 | 38 | — |
| TOTAL ASSETS | $ 420,832 | $ 25,243 | $ 131,950 |
| | | | |
| LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT) | | | |
| Current liabilities: | | | |
| Accounts payable | $ 7,076 | $ 1,345 | $ 178 |
| Accrued expenses | 2,741 | 5,532 | 1,233 |
| Current portion of land contract and promissory note | 66,658 | — | — |
| Total current liabilities | 76,475 | 6,877 | 1,411 |
| Convertible promissory notes | — | 25,094 | — |
| Land contract and promissory note obligations, net of current portion | 42,716 | — | — |
| Warrant liabilities | 19,447 | — | — |
| Pension benefit obligation | 114 | — | 109 |
| Other long-term liabilities | 443 | — | — |
| Total liabilities | 139,195 | 31,971 | 1,520 |
| COMMITMENTS AND CONTINGENCIES | | | |
| Predecessor parent's net investment | — | — | 130,430 |
| Preferred stock, $0.0001 par value; 100 million shares authorized; none issued or outstanding. | — | — | — |
| Common stock, $0.0001 par value; 1 billion shares authorized; 124,027,012 issued and 118,777,012 outstanding at June 30, 2021 and 82,117,288 issued and outstanding at December 31, 2020. | 12 | 8 | — |
| Additional paid-in capital | 301,467 | 992 | — |
| Accumulated deficit | (19,842) | (7,728) | — |
| Total shareholders' equity (deficit) | 281,637 | (6,728) | 130,430 |
| TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY | $ 420,832 | $ 25,243 | $ 131,950 |

54. The statements contained in ¶¶ 34-53 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) ELMS's previously issued financial statements were false and unreliable; (ii) ELMS's earlier reported financial statements would need restatement; (iii) certain EMLS executives and/or directors purchased equity in the Company at substantial discounts to market value without obtaining an independent valuation; (iv) on November 25, 2021, the Company's Board formed an independent Special Committee to conduct an inquiry into certain

sales of equity securities made by and to individuals associated with the Company; and (v) as a result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**THE TRUTH EMERGES**

55.     On February 2, 2022, the Company issued a press release entitled *Electric Last Mile Solutions Announces Leadership Transition and Financial Update*, announcing changes to is leadership and that certain of its financial statements needed restatement:

> *Transition Follows Resignation of CEO and President James Taylor and Chairman Jason Luo Company Advises Non-Reliance on Financial Statements, Which Will be Restated*
>
> Electric Last Mile Solutions, Inc. (Nasdaq: ELMS; ELMSW) ("ELMS" or "the Company"), a pioneer of electric and intelligent mobility solutions for commercial vehicle customers, today announced that Shauna McIntyre, a member of the Company's Board of Directors, has been appointed as Interim Chief Executive Officer and President, ***succeeding James Taylor, who has resigned from his role as Chief Executive Officer and a member of the Board***. In addition, Brian Krzanich has been appointed Non-Executive Chairman of the Board, ***replacing Jason Luo, who has also resigned from his position as Executive Chairman of the Board. The departures follow an investigation conducted by a Special Committee of the Board of Directors (the "Special Committee").***
>
> ***On November 25, 2021, the Company's Board formed an independent Special Committee to conduct an inquiry into certain sales of equity securities made by and to individuals associated with the Company***, the legal, disclosure and tax consequences of those transactions, and other issues that arose in connection those sales. ***Based on the Special Committee's investigation, the Company has concluded that in November and December 2020, shortly before the Company's December 10, 2020 announcement of a definitive agreement for a business combination with Forum Merger III Corporation, certain Electric Last Mile Inc. executives purchased equity in the Company at substantial discounts to market value without obtaining an independent valuation.*** Mr. Taylor purchased equity in these transactions. Mr. Luo participated in these and other transactions and directly or indirectly purchased and sold equity in such transactions.
>
> ***In addition, on January 26, 2022, on the basis of the Special Committee investigation, the Board concluded that the Company's previously issued consolidated financial statements should be restated and, therefore, should no***

*longer be relied upon. **The financial statements in question cover the period as of December 31, 2020, the period from August 20, 2020 (inception) through December 31, 2020, the six months ended June 30, and the nine months ended September 30, 2021.** In connection with this conclusion, the Company, together with its advisors, is evaluating the accounting and treatment of certain equity issuances to executive officers. Although the Company cannot, at this time, estimate when it will file its restated financial statements for such periods, it is diligently pursuing completion of the restatement, including with respect to an evaluation of the Company's financial statement reserves for tax payments and contingencies.  [Emphasis added].*

56.     On this news, the Company's share price fell $2.88 per share, or 51%, to close at $2.71 per share on February 2, 2022, on unusually heavy trading volume, damaging investors.

57.     On February 14, 2022 the Company filed a current report on Form 8-K revealing that BDO had resigned as the Company's independent registered public accounting firm had resigned for the fiscal year ended December 31, 2021.

58.     In the February 14, 2022 Form 8-K, the Company alleged that an affiliate of BDO helped structure the improper equity transactions, and the Company identified two particular disagreements with BDO; whether BDO complied with applicable auditor independence requirements and whether the Company has taken timely and appropriate remedial action within the meaning of Section 10A of the Exchange Act.  Regarding BDO's compliance with applicable auditor independence requirements:

*Disagreement over BDO's compliance with the SEC's and PCAOB's auditor independence rules*

As an independent registered public accounting firm, BDO and its associated persons were required by the SEC's and PCAOB's rules to be independent of the Company throughout the audit and professional engagement period. Furthermore, under PCAOB Rule 3526(b), BDO was required to: (i) describe in writing to the Audit Committee all relationships between BDO, BDO's affiliates and the Company that may reasonably be thought to bear on BDO's independence; (ii) discuss with the Audit Committee the potential effects of any such relationships on BDO's independence; (iii) affirm in writing to the Audit Committee that BDO is independent under SEC and PCAOB rules; and (iv) document the substance of its discussion with the Audit Committee.

During the course of its investigation, the Special Committee identified potential concerns regarding BDO's independence. In particular, the Special Committee identified that BDO's Tax Advisory Group ("BDO Tax") had helped to create and structure the Transactions that ultimately resulted in the resignations of ELMI's co- founder, Jason Luo, who served as Executive Chairman of ELMI and subsequently served as Executive Chairman of the Company until his resignation on February 1, 2022, and of Jim Taylor, our former Chief Executive Officer.

BDO Tax provided advice to Mr. Luo and his affiliates. PCAOB Rule 3522 restricts the ability of an auditor to provide non-audit services to an audit client related to the tax treatment of a "confidential transaction" or a transaction "a significant purpose of which is tax avoidance." Similarly, PCAOB Rule 3523 limits an auditor's provision of tax services to a "person in a financial reporting oversight role at the issuer audit client."

The Special Committee also identified BDO's failure to disclose the BDO Tax engagement in BDO's letter to the Audit Committee dated July 15, 2021, in which BDO purported to list relationships between the Company and BDO and its affiliates that may reasonably be thought to bear on its independence. PCAOB Rule 3526(b) provides that a registered public accounting firm must, at least annually, describe, in writing, to the audit committee of an audit client, all relationships between the firm and any affiliates of the firm and the audit client or persons in financial reporting oversight roles at the audit client, that, as of the date of the communication, may reasonably be thought to bear on independence.

The Company, the Audit Committee and their representatives repeatedly requested that BDO provide its independence analysis with respect to the services provided by BDO Tax. As of the date of this report, BDO has failed to provide the requested information.

59.     Regarding BDO's claims that the Company did not take timely and appropriate

remedial action:

The Company also believes that BDO wrongly claimed that the Company did not take timely and appropriate remedial action with respect to the matters reported in its February 1 Form 8-K.

Exchange Act Section 10A requires an auditor that has detected the possible occurrence of certain "illegal acts" to, among other things, inform management and the audit committee of such acts.  In addition, under Section 10A the auditor must notify the board if the company's management and board have not taken "timely and appropriate remedial actions with respect to the illegal act."

On February 8 – the date of its resignation – BDO sent a separate letter addressed

23

to the Board invoking Section 10A and claiming that the Company had not taken such timely and appropriate remedial action. The next day, on February 9, 2022, the Audit Committee sent a letter to BDO responding in detail to BDO's claims. As noted below, this correspondence is attached as exhibits to this filing.

Contrary to BDO's claim that the Company failed to respond adequately to the discovery of the Transactions, it was the Company itself that uncovered the Transactions and brought them to the attention of BDO. The Board formed the Special Committee and caused it to investigate the issues discussed in the February 1 Form 8-K. The Special Committee provided BDO regular updates throughout the investigation process.

BDO's purported claim under Section 10A rings particularly hollow given BDO Tax's role in helping to structure the Transactions – matters which ultimately resulted in the resignation of the Company's former Chief Executive Officer and former Executive Chairman. Indeed, BDO itself had an obligation under Section 10A(a)(2) to include in its audit "procedures designed to identify related party transactions that are material to the financial statements or otherwise require disclosure therein." Given that the Special Committee brought the Transactions to the attention of BDO, and not the other way around, it is not clear how BDO met this requirement.

In sum, the Company believes BDO's claims are directly at odds with the facts of its engagement, BDO's involvement in and contemporary awareness of the underlying transactions, and the regular updates that the Special Committee provided to BDO throughout the investigation process.

60.     On March 4, 2022, the Company filed a Form 8-K/A with the SEC, attaching as an exhibit a letter of BDO dated March 1, 2022, in which BDO disagreed with certain statements made in the Company's Form 8-K filed on February 14, 2022.

61.     On March 4, 2022, the Company filed a Form 8-K with the SEC stating that the Board approved a planned reduction in force of 50 employees on February 21, 2022.  The Form 8-K explained that the reduction in force was "part of an overall plan to focus the Company on its core business and streamline its cost structure."

62.     On March 11, 2022, the Company filed a Form 8-K with the SEC.  The Form 8-K stated that the Company had terminated Defendant Taylor's consulting agreement effective May 10, 2022.

63. The March 11, 2022 Form 8-K also provided the following update on vehicle status:

> On February 14, 2022, Electric Last Mile Solutions, Inc. (the "Company") announced in a Current Report on Form 8-K that it was conducting a comprehensive review of the status of its products and commercialization plan under the guidance of the Company's new leadership. With the assistance of outside consultants, management is continuing to assess the Company's planned product offerings, production plans, and certification processes, including the feasibility of meeting previously announced targets.
>
> The Company currently expects to commence production of certified Urban Delivery vehicles no earlier than the end of 2022 and into first quarter of 2023, followed by the Urban Utility vehicle no earlier than the first half of 2023. The Company had previously disclosed in September 2021 that it had successfully launched the ELMS Urban Delivery vehicle, and in November 2021, the Company announced that it expected to have certified Urban Delivery vehicles available for sale by year-end and that production of its Urban Utility vehicle was expected to commence in the second half of 2022. The operational processes planned by the Company's new leadership around certification and safety testing, vehicle durability testing and other pre-preproduction steps are causing delays in the commercialization timeframe for Urban Delivery, Urban Utility and other vehicles.
>
> Management is committed to working closely with its commercial partners to produce quality vehicles that meet appropriate safety standards and will only sell vehicles if and when such standards are met.

64. The Company also reported it was withdrawing all previously issued business outlook statements:

> ***In connection with management's review, and in light of the disclosures in this Item 7.01, the Company has decided to withdraw all previously issued business outlook and related forward-looking statements, as well as other commercialization targets issued by the Company, until such time as it has improved forecasting confidence***. The statements in this Current Report on Form 8-K hereby supersede any previously issued disclosure and guidance from the Company with respect to such matters. The Company intends to keep the public informed of its progress.  [Emphasis added].

65. The March 11, 2022 Form 8-K disclosed that on March 7, 2022, the Company learned that the SEC's Division of Enforcement is conducting an investigation of certain matters

discussed in the following: "Current Reports on Form 8-K filed by the Company on September 27, 2021, February 1, 2022 and February 14, 2022 and Exhibits 99.1 and 99.2 to Forum Merger III Corporation's Current Report on Form 8-K filed on March 16, 2021."

66.   On March 15, 2022, the Company filed a Form 8-K/A amending its March 4, 2022 Form 8-K.  The March 15, 2022 Form 8-K/A stated that the Company's planned reduction in force, announced on March 4, 2022, would cause the Company to incur net pre-tax charges of approximately $0.3 million in severance and related costs.

67.   On April 1, 2022, on Form NT 10-K, the Company filed a notification of its inability to timely file an annual report for the period ended December 31, 2021.

## DUTIES OF THE DIRECTOR DEFENDANTS

68.   By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

69.   Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

70.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules

and regulations; and

> (f)       ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

71.     Each Director Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.

72.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

73.     The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the business results and prospects of the Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

## DAMAGES TO THE COMPANY

74.     As a direct and proximate result of the Individual Defendants' misconduct, the Company has lost and will continue to lose and expend many millions of dollars.

75.     Such expenditures include, but are not limited to, the fees associated with the SEC investigation and two federal securities fraud class action lawsuits pending in the United States District Court for the District of New Jersey (the "Securities Class Actions") filed against the Company and the Company's former CEO, former Executive Chairman, two former Co-CEOs,

former CFO, and current CFO, the SEC investigation and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

76.     Such expenditures also include, but are not limited to, the costs incurred by the Company in restating its previous financial statements.

77.     Such expenditures also include, but are not limited to, the costs of the Special Committee's investigation.

78.     Such expenditures also include costs and fees associated with the ongoing disagreement between the Company and BDO regarding, *inter alia*, BDO's alleged role in the improper equity transactions, whether BDO complied with applicable auditor independence requirements, and whether the Company took timely and appropriate remedial action within the meaning of Section 10A of the Securities Exchange Act.

79.     Such expenditures also include the value for which Forum was made to overpay for acquiring ELMI, which was acquired on terms unreasonable to Forum given the undisclosed truth. Costs and occurrences evidencing the Forum's overpayment for ELMI include, but are not limited to: (i) the improper equity transactions; (ii) the Special Committee's investigation; (iii) the Company's comprehensive review of the status of its products and commercialization plan following revelations of misconduct by ELMI officers and directors; and (iv) the reduction in force of fifty (50) employees to focus the Company on its core business and streamline its cost structure, as well as the costs associated with such reduction.

80.     These expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company, including unjust compensation paid to the Individual Defendants in connection with the Incentive Plan.

81.     As a direct and proximate result of the Individual Defendants' conduct, the Company has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

82.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by Defendants.

83.     Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

84.     During the illegal and wrongful course of conduct at the Company and to the present, the Board consisted of Defendants McIntyre, Boris, Goldberg, Krzanich, and Peretz. Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

85.     Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

86.     Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff

has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

87. Each of Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

88. Each of Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

89. Additionally, each of Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**Defendant McIntrye**

90. McIntyre served as a director of the Company from the consummation of the Merger until her appointment to the position of Interim CEO on February 1, 2022. The Company provides Defendant McIntyre with her principal occupation where she receives substantial compensation. The false and misleading statements in the Merger Proxy Statement led in part to Defendant McIntyre's election to the Board, a position in connection with which she would later be appointed to the position of Interim CEO of the Company. For these reasons, Defendant McIntrye faces a substantial likelihood of liability, is not independent or disinterested, and demand upon him is futile and, therefore, excused.

**Defendant Boris**

91.     Defendant Boris signed the false and misleading statements contained in the 2020 10-K and the 2020 10-K/A.  In addition, the Merger Proxy Statement was solicited on his behalf and the false and misleading statements contained therein contributed to his reelection to the Board.  Moreover, Defendant Boris is a defendant in the Securities Class Actions.  For these reasons, Defendant Boris faces a substantial likelihood of liability, is not independent or disinterested, and demand upon him is futile and, therefore, excused.

**Defendant Goldberg**

92.     Defendant Goldberg served as a director of Forum from its IPO until the Merger, whereupon he began serving as a director of the merged Company.  Defendant Goldberg also serves as a member of the Audit Committee and the Compensation Committee.  Defendant Goldberg also signed the false and misleading statements contained in the 2020 10-K and the 2020 10-K/A.  Further, the Merger Proxy Statement was solicited on his behalf and the false and misleading statements contained therein contributed to his election to the Board.

93.     In addition, Defendant Goldberg served as a member of Forum's Audit Committee prior to the Merger where Defendant Goldberg failed to oversee the integrity of Forum's financial statements, Forum's internal control over financial reporting, and the effectiveness of the Forum's disclosure controls and procedures, as Defendant Goldberg was required to do under the Forum Audit Committee Charter.

94.     For these reasons, Defendant Goldberg faces a substantial likelihood of liability, is not independent or disinterested, and demand upon him is futile and, therefore, excused.

**Defendant Krzanich**

95.     Defendant Krzanich has served as a Company director since the Merger was consummated.  Defendant Krzanich was appointed to serve as Board Chair on February 1, 2022.

The false and misleading statements in the Merger Proxy Statement led in part to Defendant Krzanich's election to the Board.  As a trusted Company director, Defendant Krzanich conducted little oversight of the Company to make false and misleading statements, disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and disregarded his duties to protect corporate assets.

96.     For these reasons, Defendant Krzanich faces a substantial likelihood of liability, is not independent or disinterested, and demand upon him is futile and, therefore, excused.

**Defendant Peretz**

97.     Peretz has served as a Company director since the consummation of the Merger. Defendant Peretz is the Chair of both the Audit Committee and the Compensation Committee. The false and misleading statements in the Merger Proxy Statement led in part to Defendant Peretz's election to the Board.  As a trusted Company director, Defendant Peretz conducted little oversight of the Company to make false and misleading statements, disregarded his duties to monitor internal controls over reporting, and disregarded his duties to protect corporate assets. For these reasons, Defendant Peretz faces a substantial likelihood of liability, is not independent or disinterested, and demand upon him is futile and, therefore, excused.

## OTHER REASONS DEMAND IS FUTILE

**Defendants Boris and Goldberg**

98.     Directors Boris and Goldberg are affiliated with Defendants Kiev, Katzman, Berns, and Nachbor through Forum and its affiliated entities. In particular, these six defendants are all members of Sponsor, which played a leading role in effecting the IPO and the Merger.

**The Audit Committee**

99.     Defendants Boris, Peretz, Goldberg, and Krzanich served as members of the

Company's Audit Committee during the Relevant Period.  Pursuant to the Company's Audit Committee Charter, Defendants Boris, Peretz, Goldberg, and Krzanich are responsible for overseeing accounting and financial reporting processes and reviewing and discussing with management major issues regarding accounting principles and financial statement presentations, as well as major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies.  Defendants Boris, Peretz, Goldberg, and Krzanich failed to adequately oversee the Company's reporting processes, failed to remediate major issues regarding accounting principles, financial statement presentations, and identify or remedy deficiencies with the Company's internal controls, and failed prevent the Company from issuing false and misleading financial statements with the SEC.  Thus, Defendants Boris, Peretz, Goldberg, and Krzanich breached their fiduciary duties, are not disinterested, and demand is excused as to them.

**Defendant Luo**

100.  In addition, the Directors are beholden to and controlled by Defendant Luo, who is a co-founder and former Executive Chairman of the Company. ***Defendant Luo beneficially owned approximately 59.3 million shares of Company common stock as of June 25, 2021, or 47.8%.***

### COUNT I

### (Against Defendants For Breach Of Fiduciary Duty)

101.  Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

102.  Defendants owed the Company fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed the Company the highest obligation of good faith, fair dealing,

loyalty, and due care.

103.   Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

104.   Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other public disclosures and, otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

105.   As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

106.   As a direct and proximate result of Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending and/or settling securities lawsuit and severe damage to the share price of the Company's stock, all resulting in an increased cost of capital, and reputational harm.

## COUNT II

### (Against Defendants For Waste Of Corporate Assets)

107.   Plaintiff incorporates by reference and realleges each and every allegation

contained above, as though fully set forth herein.

108.   The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.   It resulted in continuous, connected, and ongoing harm to the Company.

109.   As a result of the misconduct described above, Defendants wasted corporate assets by, *inter alia*: (a) paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (b) awarding self-interested stock options to certain officers and directors; and (c) incurring potentially millions of dollars of legal liability and/or legal costs to defend and/or settle the Securities Class Actions.

110.   As a result of the waste of corporate assets, Defendants are liable to the Company.

111.   Plaintiff, on behalf of the Company, has no adequate remedy at law.

<u>**COUNT III**</u>

<u>**(Against Defendants For Unjust Enrichment)**</u>

112.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

113.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, Defendants were unjustly enriched at the expense of, and the detriment of, the Company.

114.   Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance or artificially inflated valuation of the Company or received compensation or other payments that were unjust in light of Defendants' bad faith conduct.

115.   Plaintiff, as a shareholder and representative of the Company, seeks restitution

from Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

116.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## COUNT IV

### (Against Defendants Taylor, Luo, Boris, Kiev, Li, and Song for Contribution Under Sections 10(b) and 21D of the Exchange Act)

117.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

118.    The Company and Defendants Taylor, Luo, Boris, Kiev, Li, and Song are named as defendants in the Securities Class Actions, which assert claims under the federal securities laws for violations of Sections 10(b) and 21D of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.   If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Taylor, Luo, Boris, Kiev, Li, and Song willful and/or reckless violations of their obligations as officers and/or director of the Company.

119.    Defendants Taylor, Luo, Boris, Kiev, Li, and Song, because of their positions of control and authority, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Actions.

120.    Accordingly, Defendants Taylor, Luo, Boris, Kiev, Li, and Song are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of

action for contribution arising out of violations of the Exchange Act.

121.     As such, the Company is entitled to receive all appropriate contribution or indemnification from Defendants Taylor, Luo, Boris, Kiev, Li, and Song.

## COUNT V

**(Against the Forum Defendants and Defendants Taylor and Luo for Violations of Section 14(a) of the Exchange Act)**

122.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

123.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

124.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

125.     Under the direction and watch of both Forum Defendants and Defendants Taylor and Luo, the Merger Proxy Statement failed to disclose: (i) contrary to the Merger Proxy Statement's descriptions of the Board's risk oversight function and the Forum Audit Committee's responsibilities, the Board and Forum's Audit Committee were not adequately

exercising these functions, were causing or permitting the Company to issue false and misleading statements, and thus the Board were breaching their fiduciary duties; and (ii) the Board at that time who were breaching their fiduciary duties and who would serve on the post-Merger Board were improperly interested in increasing their unjust compensation by seeking shareholder approval of the Incentive Plan.

126.    The Merger Proxy Statement also failed to disclose that: (i) certain of the Company's and ELMI's financial statements were false and unreliable; (ii) certain ELMI executives and/or directors had engaged in the improper equity transactions in which they purchased discounted equity without obtaining an independent valuation; and (iii) the Company failed to maintain adequate internal controls.  As a result, the Merger Proxy Statement was materially false and misleading.

127.    In the exercise of reasonable care, the Forum Defendants should have known that by misrepresenting, the statements contained in the Merger Proxy Statement were materially false and misleading. The misrepresentations were material to shareholders in voting on the matters set forth for shareholder determination in the Merger Proxy Statement, which related to the Merger and included but were limited to: (i) approval of the Merger; (ii) approval of the issuance of more than 20% of the Company's issued and outstanding common stock in connection with the Merger, including to ELMI securityholders and to SERES; (iii) approval of the Company's third amended and restated certificate of incorporation; (iv) approval on a non-binding advisory basis certain differences between the Company's second amended and restated certificate of incorporation and the proposed third amended and restated certificate of incorporation; (v) approval of the Incentive Plan; and (vi) the election of Defendants Taylor, Luo, Boris, Goldberg, Krzanich, McIntyre, and Peretz to serve as directors of the post-Merger

Board.

128.    The false and misleading elements of the Merger Proxy Statement led Forum shareholders to: (i) approve the Merger, the terms of which were unfavorable to Forum shareholders in light of the Improper Equity Transactions; (ii) reelect Defendants Boris and Goldberg to the Board, who had breached their fiduciary duties to the Company; (iii) elect Defendants Luo and Taylor to the Board, who had engaged in the improper equity transactions and who had aided and abetted the breaches of fiduciary duty by the Forum defendants; (iv) elect Defendants McIntyre, Peretz, and Krzanich to the Board, who breached their fiduciary duties to the Company; (v) approve the issuance of more than 20% of the Company's issued and outstanding common stock; (vi) approve the Company's third amended and restated certificate of incorporation; (vii) approve and adopt, on a non-binding advisory basis, certain differences between the Company's former and the third amended and restated certificate of incorporation; and (viii) approve the Incentive Plan, allowing the Individual Defendants to receive unjust compensation.

129.    The Company was damaged as a result of the Forum Defendants' material misrepresentations and omissions in the Merger Proxy Statement.

130.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

<u>**COUNT VI**</u>

**(Against the ELMI Defendants for Aiding and Abetting**
<u>**Breach of Fiduciary Duty)**</u>

131.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

132.    The ELMI Defendants aided and abetted the Forum Defendants who breached their fiduciary duties to the Company.

133.    The ELMI Defendants' misconduct resulted in continuous, connected, and ongoing harm to the Company.

134.    The ELMI Defendants promoted the Merger by issuing false and misleading statements concerning ELMI.   The ELMI Defendants controlled and operated ELMI, the Company's operational predecessor, and caused ELMI to jointly issue financial statements which were incorporated into the Company's SEC filings and which contained materially false and misleading statements promoting the Company's business, operations, and prospects.

135.    The ELMI Defendants are jointly and severally liable to the same extent as the Forum Defendants are liable for breaches of fiduciary duty as set forth herein or violations of any other laws.

136.    As a direct and proximate result of the ELMI Defendants' aiding and abetting of the Forum Defendants' breaches of duty alleged herein, the Company has sustained and will continue to sustain substantial damages.

137.    Plaintiff on behalf of the Company has no adequate remedy at law.

### **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be

necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and risk management, and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.     Awarding to the Company restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff demands a trial by jury on all issues so triable.

Dated: April 19, 2022

**GAINEY MCKENNA & EGLESTON**

By: */s/ Barry Gainey*
Barry Gainey, Esq.
375 Abbott Road
Paramus, New Jersey 07652
Telephone: (201) 225-9001
Facsimile: (201) 225-9002
Email: bgainey@gme-law.com

Thomas J. McKenna
Gregory M. Egleston
501 Fifth Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Attorneys for Plaintiff*